Ashburn, J.
After a careful examination and consideration of the questions made in the progress of the trial, and assigned for error, a majority of the court are of opinion no error in the proceeding intervened to the substantial prejudice of the plaintiff in error. A majority of the court are of opinion that, in the fifth and eighth special charges, as requested by plaintiff in error and as modified by the court, there was error.
No question made in the case, except such as arise upon the aforesaid instructions, and incident thereto, will be considered at length in the opinion.
*289 To a proper understanding of the questions for consideration on the requests to charge, and the modifications thereto, we must understand the relation of the parties to the facts, and their knowledge in regard to them at and just before the time the release was executed. Touching these relations, the facts and situation of the acting parties, Reed, the plaintiff, and Rice, the agent, do not substantially disagree.
It should be stated the policies contained a warranty that no incendiary danger was either threatened or apprehended, and against keeping gunpowder by the insured:
After the loss Reed, and Rice the company’s adjuster, met in St. Andrews, where the loss occurred. They discussed the matter without apparent reserve. The adjuster obtaining from Reed and other sources what information he could in regard to the fire and the loss. On February 21, 1873, they went to Paulding. There Reed’s statement in writing under oath was taken, he making answers to all questions asked and upon which the company desired, from him, information. Upon its completion, Rice told Reed he had been very fair in his answers to questions, but that, according to the policies and his examination, he had,, no claim on the AEtna Insurance Company ; that his loss wras a dead loss to him. Rice gave as his reasons that the company did not insure against incendiary dangers, and- they had been informed the fire was the work of an incendiary, and that Reed had kept gunpowder contrary to the policy. He read to Reed some decisions from Littleton’s Digest to. show him he had no legal claim against the company. The points of two decisions were read — one" that the warranty must be true, and that the application must be like the policy. Rice read to him “ those decisions in favor of the company to let him see if he had a claim or not, and to enable him to judge on both sides of the question, and Rice says I told him that if he brought suit we should ask for a removal into the federal court, and that eventually we should, beat him.” . . “I read the decisions for the purpose of *290 getting him to sign the release.” . . “I told him that in my judgment he had no claim; that he might go out and see an attorney who would differ with me, and that to buy the peace of the company I would rather give him a hundred dollars than to have trouble. I told him this as an inducement for him to sign the release.” The draft is a conditional draft. Reed did not give up the policy. The draft is as follows :
“ $100. Paulding, Ohio, February 21, 1873.
“At sight, pay to the order of Uriah W. Reed, one hundred dollars, and charge to account of loss under general agency policy, 113,120. This draft to be paid only when accompanied by the policy.
“ E. F. Rice, Special Agent.
“ To Branch Office, 171 Vine street, .¿Etna Insurance Company, Cincinnati, Ohio.”
Reed testified that “ Rice said that if I went to law they would beat me in any court, but that it would not be tried here. He said I might go and see some attorney about it, and that they would tell me that I could get the money, and in order to get a fee the attorney would commence suit. That I had no recourses on the company, but as it would cost the company something to run it through the court, they would pay me back my premiums. He told me that he would give me back my premiums with good interest; would give me one hundred dollars. I told him if I could not recover, as according to his statement I could not, then there was no use in my seeing an attorney.
“ He told me that I had better take a hundred dollars, and said I could get nothing by law, and referred me to the decisions. I have no recollection of what the books were that he read to me; in fact I had forgotten all about it until he spoke about it at the last term of court. At that time I was very much excited, thinking I was ruined and had lost everything. Taking his word for the matter, and believing what he said to me, I scarcely remember what he read to me. I believed his statements in the matter, and acted on them, and signed that release. I do n’t remember *291 that Mr. Rice told me wliat the papers were, nor whether ■ he did say anything. Do n’t know how many papers I : signed. This release was to be left at Mr. Potter’s until I - should bring over the policy, which T was to bring back in ■ a few days, and when I should bring back the policy I was ■ to get a release or copy and a draft, and give up the policy. I was to get the draft cash ed at Mr. Potter’s. 11 eft the release . lying on the table when I left there. I kept the draft; I - never gave it up to the company; I never gave any authority to give it up to the company ; never received any ■ money for signing the release.
“After going home from Paulding, I concluded to see an ■ attorney before bringing back my policy to Mr. Potter, to : ascertain whether or not my case was really lost. I went to Mr. Newbegin and gave to him my policy.
The personal relation of the parties was not one calculated to beget confidence or reliance, but the contrary. . Rice was acting avowedly as the agent of a party whose ■ interests were averse to Reed, and common intelligence would have caused Reed to know he was not .acting as his friend or advising his interests. Presumptively he would not be likely to stand in a relation different from other •. persons representing adverse interests. From the time the ■ within statement was completed, Rice acted in a hostile' rather than a friendly spirit, and with a strong assertion- ¡ of opinion claimed the loss was a dead loss to Reed, and ■ thus endeavored to induce Reed to think he could do no ' better than take his offer of one hundred dollars. It was not done with the thought on either side that he was a friendly adviser, but rather as one driving the best bargain he could for his employer. In this Reed could scarcely be deceived. All this time Reed was apparently as fully conversant with the facts of the case as Rice, and at liberty to ascertain the law of his case if he desired to do so. It . was even suggested to him to do so with the probable re suit.
The issue made on the tenth defense, and upon which the court was requested to give the law, was in reference • *292 to a state of facts upon which plaintiff below claimed he had been induced by fraudulent representations made by the company’s agent upon which he had a right to rely, and did rely, to make a settlement and release his rights under the policies. The instruction to be given was to be the law in relation to the state of facts before stated. The rule of the law is, that where fraud enters into a transaction to the injury of the party upon whom it operates, it will be his excuse for avoiding the apparent obligations of the contract. But it is not every erroneous representation that will avoid a contract. To have that effect it must be as to a fact material in the transaction, not mere opinion. It must be a representation of a material matter upon which the party, whom it affects injuriously, had a right to rely and did rely. If the representation be mere matter of opinion, or of a fact equally within the knowledge of both parties, or one upon which the party had no right to rely, the representations, though acted on, will not vitiate the transaction.
This is always the ease where the parties are mutually cognizant of the facts acted on, or stand on an equal footing in relation to them, and there exists no fiduciary relation between them. The law will not lend its aid to help one thus situated and advised, if he voluntarily neglects to protect himself by the exercise of his common sense. See the following cases, more or less strongly maintaining these principles: Foley v. Cowgul, 5 Blackf. 18; Galling v. Newall, 9 Ind. 572; Bigelow on Fraud, 18, 66; Mayhew v. Phœnix Ins. Co., 23 Mich. 105; Moore v. Turberville, 2 Bibb, 602; Saunders v. Halterman, 2 Iredell, 32; Farrar v. Alston, 1 Dev. 69; Fulton v. Hood., 34 Penn. St. 365 ; Anderson v. Burnett, 5 How. (Miss.) 165; Salem India Rubber Co. v. Adams, 23 Pick. 256; Hall v. Thompson, 1 S. & M. 443; 1 Story’s Equity, § 207 (10 ed.); 1 Story on Contracts, § 636 (5 ed.)
With this understanding of the facts and the general principle applicable to such state of facts, we will consider the requests and their modifications.
*293 The legal principle embodied in the modification to the fifth request is antagonistic to the principle of that request and destructive of it. Of this the jury were not instructed. Both were given to the jury. This left the state of the law before the jury in au uncertain condition, and one well calculated to confuse and mislead.
Again, if the jury understood the modification to be destructive of the fifth charge as requested, the words “ and' the law applicable thereto” should have been stricken out, and the converse of the proposition in the modification given to the jury. This to the end that if the jury should find that Reed was as well informed in relation to the facts on which he acted as the adjuster, he was not in a condition to claim the right to rely upon the representations of the adjuster. As the modification was given, the jury were' liable to be misled by a consideration of a matter not properly for their consideration on the state of facts in the case.
Again, by the modification the jury was instructed to consider as an element of fraud in the transaction Reed’s-ignorance of the law of his case, and his right to rely upon the representations of defendant’s agent in regard to his legal rights. In this the modification was misleading, for the reason that it was not a correct statement of the law on the question. The agent’s opinion as to Reed’s legal rights, however strongly stated, was not a misrepresentation of a fact for the consideration of the jury. In Upton) Assignee, v. Tribelcock, 1 Otto, Hunt, J., on page 50, says, “ That a misrepresentation or misunderstanding of the law will not vitiate a contract when there is no misunderstanding of the facts, is well settled.”
In the case of Fish v. Clelland, 83 Ill. 243, this principle is clearly stated in his opinion by Justice Beckwith as follows : “A representation of what the law will or will not permit to be done is one on which the party to whom it is made has no right to rely; and if he does so rely, it is his folly, and he can not ask the law to relieve him from the consequences. The truth or falsehood of such a represen *294 tation can be tested by ordinary vigilance and attention. It is an opinion in regard to the law, and is always understood as such.” See 5 Hill, 303.
The law is presumed to be equally within the knowledge of all parties.
Applying this doctrine practically, the representations of Rice to Reed as to the law of the case was but an opinion as to his legal, rights, and, though erroneous, should not have been treated and submitted, as it was in the modification, to the jury as an element of fraudulent representations upon which Reed had a right to rely. It was not ■a fact in the case for the consideration of the jury, and the court should have so told them.
The modification to defendant’s eighth request is claimed ■to be erroneous.
,This modification, if applied to the-second clause alone of the request, and that clause is applied to a misrepresentation of facts only, would not be objectionable. In that case, the modification would so amend the second clause as to make it a true declaration of the law. “ If the party made the representation not knowing whether it was true or false, he can not be considered as innocent; since.a positive assertion of a fact is, by plain implication, an assertion ■of knowledge concerning the fact. Hence, if a party have ,no knowledge, he has asserted for true what he knew’to be false.” Bigelow on Fraud, 61; Stone v. Covill, 29 Mich. 359, and cases cited; Woodruff v. Garner, 27 Ind. 4; Fisher v. Millen, 103 Mass. 503 ; Taylor v. Ashton, 11 M. & W. 400; Foardy. McComb, 12 Bush, 723 ; 1 Story’s Equity Juris. § 193 ; Nugent v. C., H. & I. Street R. R. Co., 2 Dis. 302.
This modification, however, if applied only to the first clause of the request, in which the court is asked to charge on the effect of misrepresentations as to plaintiff’s legal rights, is unsoimd. We have already seen that misrepresentations, touching a party’s legal rights, will generally afford no sufficient reason on which to avoid a contract. Such representations, however erroneous and strongly as *295 serted, are to be treated, when made to a party free to inform himself of his legal rights, as mere statements of opinion. The exceptions to the operation of this rule are cases in which some fiduciary relation is found to exist, or such circumstances as show a confidential relation which gives the injured party good right to rely upon such representations, and he does so to his injury. When this modification is applied to the whole request, the same trouble remains. As it' is left uncertain whether the fraudulent statements alluded to by the court, and to which the modification was to apply, was of facts, of law, or both, the instruction as given was calculated to mislead. It is obnoxious to the rule, that, “ the charge ought not only to be correct, but be so adapted to the case and so explicit as not to be misunderstood or misconstrued by the jury.” Graham & Waterman on New Trials, 774; L. M. R. R. Co. v. Witmore, 19 Ohio St. 111.
Judgment reversed and cause remanded to the court of common pleas for new trial.